LE–HI IMPLEMENT CO. OF MARIANNA, INC., et al., Plaintiffs and Counterclaim Defendants,

v.

WHITE FARM EQUIPMENT COMPANY (formerly Oliver Corporation) and the White Motor Credit Corporation, Defendants, Counterclaim Plaintiffs and Plaintiffs.

Ralph H. HINEMAN, Trustee, Plaintiff,

v.

Dorothy V. LEACH et al., Defendants.

Civ. A. No. H 68–C–2.

United States District Court,
E. D. Arkansas, E. D.

July 30, 1970.

---

E. C. Gathings, West Memphis, Ark., Gerland P. Patten, Patten & Brown, Little Rock, Ark., for plaintiffs.

Richard H. Kremer, Rosenfield, Borod, Fones & Bogatin, Memphis, Tenn., Edward Lester, Lester & Shults, Little Rock, Ark., for defendants.

OREN HARRIS, Chief Judge.

### Nature of the Case

For convenience, the following abbreviations will be used: the Corporation (abbreviating, LE–HI Implement Co. of Marianna, Inc.); the Partnership (LE–HI Implement Co., a partnership composed of J. W. Leach and J. M. Leach Jr.); Oliver (White Farm Equipment Company, successor to the Oliver Corporation); Credit Corporation (White Motor Credit Corporation); and Plan (Oliver Retail Credit Plan).

The Corporation, a farm equipment dealership, filed the original action against Oliver, alleging that the Corporation's three shareholders had individually guaranteed the Corporation's payment to Oliver and/or Credit Corporation, and that Oliver, a manufacturer, had breached its Dealer Contract in failing to make available to Corporation the Oliver Retail Credit Plan. Corporation prayed for cancellation of said guaranty, rescission, an accounting, and general relief.

Upon motion and order of Court joining additional parties, Oliver and Credit Corporation were cast in the additional roles of Counterclaim Plaintiffs and Plaintiffs, and the Partnership and partners, who operate another farm equipment dealership, were made Defendants. Credit Corporation, which engages in wholesale financing of farm equipment dealerships, alleged it had a security interest in the Corporation's inventory and a default had occurred, entitling it to an immediate right to possession thereto. Both Oliver and Credit Corporation alleged that approximately two months prior to the filing of the original action, a settlement was effected between the Plaintiffs and Oliver and Credit Corporation, under which four promissory notes, certain security agreements respecting personal property and a Deed of Trust were executed and delivered. The Corporation and the three shareholders co-made and delivered two of these notes: one to Oliver, the other to Credit Corporation; the Partnership and the partners co-made and delivered two of these notes: one to Oliver and the other to Credit Corporation. A Deed of Trust covering approximately 320 acres in Crittenden County, Arkansas, was given to secure these four notes.

Oliver and Credit Corporation each alleged a default which accelerated the maturity of all four notes and the right to immediate possession and judicial foreclosure. Oliver and Credit Corporation respectively prayed judgment based on the said notes, replevin of the personalty, judicial foreclosure of the realty, enforcement of the guaranty against the individuals, an accounting between the parties and general relief. Also made Defendants were parties interested in the real estate security.

On December 21, 1967, the original action was filed in the Lee County (Arkansas) Chancery Court, and on January 5, 1968, Oliver petitioned this Court for removal on the bases of the diversity of the parties' citizenship and the amount, exclusive of interest and costs, exceeding $10,000.00. On January 23, 1968, the Partnership paid Oliver the principal and interest on a $16,519.26 promissory note, one of said four notes. On March 11, 1968, the Court entered orders for delivery to Oliver and Credit Corporation respecting the personalty subject to the security agreements and thereafter repossession of some of said personalty was effected.

### Contentions of the Parties

In their Complaint, the original Plaintiffs alleged that Oliver had breached its Dealer Contract by wholly failing to make available to it the Plan. In the Plaintiffs' post-trial briefs, they place no emphasis on Oliver's unwillingness to finance the remainder of the Chipman Brothers' purchase. Instead, they stress their contention that in mid-1967, Oliver falsely told the Corporation it had no Plan, thereby materially breaching the Dealer Contract, voiding the Guaranty and voiding the Deeds of Trust as they secure the Corporation's obligations. The Corporation, Partnership, Barrie Moffatt and the Leach brothers also contend that:

1. The three principal notes are voided for want of consideration and by reason of Oliver's merger;

2. That the Court should allow the Corporation credit for its parts inventory and order the Corporation to deliver same to Oliver; and

3. That the judgment against the Partnership and partners be limited to $45,873.31 and that the Court order sale of the real estate security and apply the proceeds toward satisfaction thereof.

Oliver and Credit Corporation contend that:

1. There was no breach of contract in that Oliver made the Plan available, there was no reliance by Plaintiffs, no right to rely, no damages, no causal connection, and a breach, if any, was not material and was ratified and waived by the Plaintiffs;

2. As against Credit Corporation, the Guaranty could not be cancelled because no grounds for relief or relief was sought, pleaded or proved;

3. The Corporation and the guarantors are not in equity entitled to rescission or cancellation;

4. Oliver and Credit Corporation are entitled to a money judgment based upon the three notes and based upon the Guaranty for the obligations of the Corporation in excess of the notes;

5. They are entitled to a judgment sustaining the Orders for Delivery of the personal property; and

6. They are entitled to judicial foreclosure of the real estate security.

### Introduction to Findings and Conclusions

After the conclusion of the trial in this case on March 31, 1970, at Helena, Arkansas, the parties were given an opportunity to file briefs. The Court has the benefit of the briefs filed respectively by the parties and a copy of the transcript of the trial in addition to the substantial record consisting of numerous pleadings, interrogatories and answers thereto, Rule 36 admissions and Local Rule 9 statements.

This is a very difficult case with respect to multiparties, their status, contention and relative position in the cause of action. It is made more difficult in view of the substantial record and the issue of accounting as requested by the major contestants.

The Court has given a great deal of attention and study to the entire proceedings and has attempted to analyze the record, numerous exhibits, the testimony of witnesses, Rule 9 statements and briefs. In considering the contention of each of the parties, the Court has concluded that there is not a great deal of difference in the final analysis of the major contentions of the Plaintiffs and the Counterclaim Defendants and the Defendants, Counterclaim Plaintiffs and Plaintiffs.

Both parties seek an accounting of their respective contentions for relief; both parties are in accord with reference to the right of Oliver and White in the replevin action. There is some difference but only slight as to certain credits; both parties agree there is a sum owing to Oliver and White by the dealers. There is a dispute as to the amount. There appears to be little, if any, dispute as to the account with the Partnership; and there appears to be no issue with reference to John Hancock Mutual Life Insurance Company, Staple Cotton Dis-

count Corporation, and others with minor interest in the case.

The two major questions at issue are: (1) breach of contract involving paragraph 8 of the dealer contract on the question of the availability of the Plan, and (2) the accounting as submitted by the record and testimony of the parties.

### Findings of Fact

The Corporation, a retailer of farm equipment and implements, is a corporation incorporated under the laws of the State of Arkansas, having its principal place of business at Marianna, Arkansas. Barrie Moffatt is a resident of Walls, Mississippi. J. W. Leach and his brother, J. M. Leach, Jr., and their wives, Dorothy V. Leach and Flora J. Leach, respectively, are residents of West Memphis, Arkansas. Barrie Moffatt and the Leach brothers are the shareholders, directors and officers of the Corporation.

LE–HI Implement Company, a partnership composed of the Leach brothers, also a retailer of farm equipment and implements, is located at the junction of U. S. Highways 70 and 79, in Crittenden County, Arkansas.

Ralph H. Hineman, Trustee, a resident of Chicago, Illinois, at the time when the original action was instituted and when removed to this Court, now resides in Memphis, Tennessee.

White Farm Equipment Company, a manufacturer of farm equipment and implements, is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Hopkins, Minnesota.

At the times when the original action was instituted and when removed to this Court, Oliver, a manufacturer of farm equipment and implements, was a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Chicago, Illinois. Subsequently, on October 9, 1969, Oliver was statutorily merged into Minneapolis-Moline, Inc., a corporation incorporated under the laws of the State of Delaware, and having its principal place of business at Hopkins, Minnesota, and on October 14, 1969, the name of Minneapolis-Moline, Inc., was changed to White Farm Equipment Company.

White Motor Credit Corporation, which handles inventory (wholesale) financing for farm equipment dealer-retailers, is a corporation incorporated under the laws of the State of Delaware, having its principal place of business at Wilmington, Delaware.

In 1959, J. W. Leach first became an Oliver Dealer at the Crittenden County location under a farm Dealer Contract and in 1962 the dealership was changed to the present partnership. During these early years, some retail sales were financed through the Oliver Retail Plan, but since 1962, none of the retail sales at either dealership has been financed through the Oliver Retail Plan.

In mid-1966, the Leach brothers and Barrie Moffatt formed the Corporation for the purpose of operating at Marianna the second farm equipment dealership. In July, 1966, Barrie Moffatt and the Leach brothers executed and delivered to Oliver and Credit Corporation their individual Guarantees of payment by the Corporation to Oliver and/or Credit Corporation. That same month the new corporation executed and delivered to Oliver a Dealer Contract and to Credit Corporation a Trust Receipt Financing Agreement, both of which were accepted in August, 1966.

Said Dealer Contract provides in part:

"7. Dealer agrees to pay immediately for any complete goods, equipment and attachments therefor, upon delivery to or payment from a retail customer, upon use (except for bona fide demonstration) or the due date set forth in the then current Oliver Agricultural Discounts and Terms Schedule or WMCC Terms Schedule, whichever is earlier."

"8. To assist Dealer to increase the sale of Oliver goods and to make payment therefor, Oliver agrees to make available to Dealer the Oliver Retail Credit Plan, and any retail purchaser's

notes and/or installment contracts purchased and accepted will be subject to the provisions and conditions of the Oliver Retail Credit Plan in effect at the time such notes and/or contracts are tendered."

"16. Dealer will, when requested by Oliver or WMCC, furnish a guaranty, in form and with a guarantor satisfactory to Oliver or WMCC, of the payment of all indebtedness that may become owing to Oliver or WMCC by Dealer for goods shipped to him under this Contract.

"If at any time Oliver or WMCC shall feel itself insecure, Dealer agrees to furnish collateral of the kind and quality satisfactory to Oliver or WMCC.

"If Dealer is in default on any payment to Oliver or WMCC, Oliver or WMCC may declare all unpaid indebtedness to Oliver or WMCC due and payable immediately and Dealer agrees to pay interest on all past due indebtedness at the highest contract rate, not exceeding eight (8) per cent per annum. The net proceeds of all collections after deducting costs and expenses of every nature will be applied on Dealer's indebtedness as Oliver or WMCC may elect."

The general conditions of the Plan provide among other things:

"Purchaser notes to be acceptable to Oliver, at its continuing option, must conform to the following:"

"7. Dealer shall forward to Oliver, on forms supplied by Oliver, the signed purchaser's note, order, and financial statement and also such other credit information Oliver may require, at date of delivery or settlement whichever first occurs. Cost of credit reports obtained by Oliver will be charged to dealer. Notes will be payable to dealer and assigned to Oliver."

"9. Oliver shall not be obligated to accept any purchaser's note until it and related papers have been submitted by dealer and approved by Oliver. Any telephone or verbal credit decision is contingent upon all signed notes and other papers, as provided herein, being received as represented and acceptable to Oliver."

"11. Purchaser's notes accepted by Oliver will be without recourse against the dealer, except—

a. When delivery of machinery is made prior to credit approval and in the judgment of Oliver purchaser is not a good credit risk.

b. If the information and/or order sent to Oliver is found to be unreliable or misleading."

"20. It is understood that the credit plan is subject to the provisions of the Dealer's Agricultural contract between Oliver and the dealer and may be changed or discontinued at any time without notice and without liability on the part of Oliver."

Chipman Brothers was a farming operation with offices at or near Tchula, Mississippi, and in which James and Harold Wayne Chipman were two of the principals.

In late 1966, Chipman Brothers first discussed with Barrie Moffatt their purchasing from the Corporation 10 Oliver Model 1950 tractors for use in farming operation near Liberty, Texas; and that during the early stages of discussions Chipman Brothers told him that they could pay all cash by procuring their own financing. Oliver's Branch Manager, J. D. Dye, testified that at the time he had known Chipman Brothers for two years and regarded the Chipman Brothers credit reputation as speculative and overextended. Mr. Dye also testified of his discussions with Barrie Moffatt about the proposed Chipman Brothers purchase, as follows:

"Q. Now, did you make any inquiry of Mr. Moffatt about the handling of financing on this Chipman deal?

A. I did.

Q. And what did you—just tell us the conversatian between you and Mr. Mof-

fatt on this occasion when the deal was first discussed.

A. Mr. Moffatt told me that these tractors were going to be used down in Texas on some new bean land they were opening up and that they would be financed by a Texas banker.

Q. Well, did you understand that to be complete financing of the deal?

A. As far as I knew, that was to be it. That's what he told me.

Q. All right, then what was your next activity with respect to the Chipman deal?

A. Well, we began to try to locate the tractors."

According to Barrie Moffatt's testimony, J. D. Dye probably did ask whether financing had been arranged for the proposed retail sale to Chipman Brothers.

J. D. Dye also testified that in January, 1967 the Corporation was anxious to procure from Oliver the tractors for resale to Chipman Brothers; and that while Mr. Dye was attending a sales meeting in Chicago, the Corporation sent a telegram to Oliver's General Sales Manager, going over Mr. Dye's head, and as a result of which his Oliver Branch was able to obtain the Model 1950 tractors.

Barrie Moffatt testified that all the Oliver tractors ordered by Chipman Brothers were sold and delivered to them by March 25, 1967. This testimony is supported by delivery receipts signed by Chipman Brothers.

The Corporation was obligated to pay for these tractors no later than March 25, 1967, the date when sale and delivery were completed. Mr. Dye then testified concerning his next activities concerning the inventory financing of the tractors by Credit Corporation:

"Q. Had anything come to your attention changing the financial expectation—financing expectation during the delivery period?

A. No.

Q. When was your next activity then with respect to the Chipman deal in contacts with the Marianna Corporation?

A. I believe in April.

    *     *     *     *     *     *

Q. And who did you contact?

A. I contacted Mr. Moffatt.

Q. And what was the subject of your conversation or what is the gist of your conversation at that time?

A. It appeared that the banker had not furnished all the money and that he was working with Commercial Credit Equipment Corporation and banks and some other people to get them financed. That's what he told me, the reason he didn't have all the money.

Q. Well, on that occasion, was anything said to you with respect to Oliver providing any retail financing?

A. No, he felt at that time it would be worked out."

According to the testimony of Ralph H. Hineman (Oliver's national credit manager) and Charles Hurley (Oliver's branch credit manager), they visited Barrie Moffatt on June 21, 1967, learning that the Corporation had sold and delivered $36,000.00 in goods without remitting the proceeds to Credit Corporation in violation of the security instruments. Mr. Hineman testified that in discussing the Chipman Purchase with Barrie Moffatt on that occasion, the latter said:

"Q. Well, tell us what he said then?

A. Well, a part of this shortage of $36,000.00 was the balance owing on this Chipman transaction, and he said that he would get this money very shortly because he had promises from the Chipmans to pay this balance to them from a loan that they expected to obtain from a Texas bank, and the Texas bank was delaying final payment until the soybean crop was planted and up so they could see if they was going to have some security to pay for the loan they were going to advance.

Q. Well, on that visit did Mr. Moffatt say anything to you or to Mr. Hurley

about Oliver Corporation taking the Chipman retail paper or whatever was left of the paper?

A. No.

Q. Now, what was promised or offered or said on the 21st that caused you to go back on the 24th?

A. Well, he expected to contact the Chipmans and have some kind of an answer for us by the 24th in regard to this balance they owed.

In Barrie Moffatt's testimony about such Texas financing:

Q. And isn't it true that you said on that occasion that you hoped to get payment from the Chipmans—for the Chipman tractors, the balance due, by virtue of a bank in Texas accepting their retail paper?

A. Mr. Fones, I'll put it this way—

Q. Just disregard the when.

A. —I remember that bank and I remember us talking about it. Now, I won't say whether it was me and Charley Hurley or Mr. Hieman (Hineman) or who talked about it, but I remember some conversation between myself and the Chipmans about the possibility of that bank handling them.

Now, if it had—it's possible if it had been the night before and I was full of hope, I might have said that, but I don't really remember saying it. I remember talking about that though, to somebody."

Mr. Hineman also testified that, on July 21, Mr. Moffatt told him that he expected to contact the Chipmans and have some kind of answer for Credit Corporation by June 24, 1967, in regard to balance owing.

Mr. Hineman also testified that during his visit on June 24, 1967, Mr. Moffatt told him that he had not been able to contact the Chipmans but that the Corporation would borrow $10,000.00 and remit same to Credit Corporation two days later.

Barrie Moffatt had prior experience in retail financing of farm equipment, having covered half of Arkansas for Commercial Credit Equipment Corporation (C.C.E.C.), an independent financing institution, as both salesman and collector, and in these capacities had become familiar with a variety of manufacturer and independent plans for retail financing of farm equipment.

During 1967, both J. W. Leach and Barrie Moffatt knew that Oliver had the right, under the Plan, to reject retail purchaser notes and contracts, solely at Oliver's option. J. W. Leach knew about Oliver's right of recourse on retail paper submitted to Oliver subsequent to delivery, and Barrie Moffatt knew that such plans had provisions for discontinuance at any time.

According to the testimony of Mr. Moffatt and J. W. Leach, the sale to the Chipmans was for a price of approximately $120,000.00 and of this the Chipmans received a credit of cash and other consideration of $50,000.00, and C.C.E.C. financed $38,000.00 leaving $32,000.00 unfinanced. In late June, 1967, the Corporation made its first request to Oliver for use of the Oliver Retail Credit Plan to finance the remaining portion of the Chipman purchase.

Oliver was unwilling to do this and told the Corporation of its unwillingness.

The next day, the 25th, Barrie Moffatt, for the Corporation, wrote Charles Hurley, credit manager of Oliver's Memphis Branch, stating that while talking to him about the Chipman Contracts, several banks asked why Oliver or White Motor did not handle the Chipman Contracts. In soliciting an answer, Mr. Moffatt's stated purpose was to set to rest any question in the banks' minds that something was wrong either with the Chipman or the dealer's credit rating. Interpreting Mr. Moffatt's letter as a plea for help, Mr. Hurley replied that Oliver does not have a Retail Finance Plan, phraseology which Mr. Hurley, as a witness, admitted was "a little stronger than what the situation actually was * * * so that it would be of as much benefit as possible to Mr. Moffatt." In light of the facts that the Corporation was having difficulty in obtaining fi-

nancing for the remainder of the Chipman sale and that Oliver then did not care to provide the financing, representatives of both the Corporation and Oliver played fast and loose with the contractual relationship, ostensibly for the purpose of persuading the banks from whom Mr. Moffatt had been seeking assistance on behalf of Chipman Brothers.

In the exchange of letters dated June 25, and July 13, 1967, the thinking and the purpose of both Barrie Moffatt and Charles Hurley were confined to the remaining unfinanced part of the Chipman purchase, the problems created thereby and the solutions therefor. The record does not reflect any evidence of any discussions between Oliver and the Corporation prior or subsequent thereto regarding any other financing of a retail purchase or of future purchases, and the record does not reflect any other evidence that would broaden the scope of said exchange of letters.

On October 16, 1967, Oliver's Branch Credit Manager visited the Corporation, determined that sales of a substantial dollar value had been made out of trust and demanded payment. During that period Oliver had put the Corporation on a C.O.D. basis. On October 25, 1967, what is referred to as the settlement instruments, were executed and delivered to Oliver and Credit Corporation. The Corporation, Partnership, Barrie Moffatt and the Leach brothers had advice of counsel at the time of the negotiations for and execution and delivery of the security instruments.

On December 12, 1967, Oliver wrote the Corporation a letter, stating its intent to terminate the Dealer Contract unless the Corporation fully paid for past-due items totalling $29,761.46 on or before December 22, 1967. This letter was received and the Partnership received a similar letter. On the 21st, one day prior to the deadline, the original action was instituted against Oliver.

The said settlement instruments dated October 25, 1967, all providing for interest at the rate of 8 per cent per annum and attorneys fees, are as follows:

a. The Partnership and the Leach brothers, individually, executed and delivered to Credit Corporation a $60,679.61 promissory note.

b. The Corporation, Moffatt and the Leach brothers executed and delivered to Credit Corporation a $77,385.18 note.

c. The Corporation, Moffatt and the Leach brothers executed and delivered to Oliver a $27,471.68 note.

d. The Partnership and the Leach brothers individually, executed and delivered to Oliver a note for $16,519.26.

e. The Leach brothers and their wives, as Grantors, executed and delivered to Oliver and Credit Corporation a Deed of Trust covering approximately 320 acres of land situate in Crittenden County, Arkansas, which will be referred to as the Crittenden County acreage.

f. A security interest in certain equipment was granted as additional collateral security, but at the trial there was no issue concerning Oliver and Credit Corporation's right to repossess. The accounting therefor is discussed later herein.

On October 20, 1967, Staple Cotton Discount Corporation, a corporation incorporated under the laws of Tennessee, with principal place of business in Greenwood, Mississippi, executed a Mortgagee's waiver and subordination agreement, covering, among other things, the Crittenden County acreage, and which waiver and subordination agreement was recorded in Book 411, page 352, on November 2, 1967, in the office of the Crittenden County Circuit Court Clerk and ex-officio Recorder. In this instrument, Staple Cotton agrees that Oliver and Credit Corporation shall have a superior lien on the Crittenden County acreage, and that Staple Cotton's lien and any equity of redemption therein shall be junior to Oliver and Credit Corporation's liens. The Deeds of Trust which are liens upon the said Crittenden County acreage and also secure indebtedness to Staple Cotton Discount Corporation recite that H. T. Odom, Trustee, as grantee,

is Trustee for the benefit of Staple Cotton Discount Corporation.

Ralph H. Hineman was substituted in the place of Cecil B. Nance, Jr., Trustee, as Trustee under the Deed of Trust covering the Crittenden County acreage and which appears of record at Book 411, page 355, in the Crittenden County Circuit Court Clerk's Office.

The aforementioned Deed of Trust, dated October 25, 1967, was executed by the said J. W. Leach and his wife, Flora J. Leach, and by J. M. Leach, Jr., and wife, Dorothy V. Leach, all of whom are parties to this action, and delivered to Oliver and Credit Corporation, conveying the following described tract of land, in Crittenden County, Arkansas, which was recorded in Book 411, page 355, in the Office of the Crittenden County Circuit Court Clerk and ex-officio Recorder, on November 2, 1967, more particularly described as follows:

The West Half (W½) of the Southwest Quarter (SW¼) of Section 32, Townhip 8 North, Range 7 East, situated in Crittenden County, Arkansas; The South Half (S½) of the Northeast Quarter (NE¼) and the Southeast Quarter (SE¼) of Section 5, Township 7 North, Range 7 East, except 1.54 acres of the Southeast Quarter (SE¼) conveyed to Arkansas State Highway Commission, by Warranty Deed recorded in Book 348, page 52, situated in Crittenden County, Arkansas.

Said instrument recites that the consideration for the conveyance was the sum of $1.00, cash paid and for the purpose of securing the performance of the covenants and agreements therein set forth and the payment of the following promissory notes of even date therewith and all bearing interest at the rate of 8 per cent per annum:

1. One note in the sum of $16,516.26 to Oliver;
2. One note in the sum of $77,385.18 to Credit Corporation;
3. One note in the sum of $27,471.68, to Oliver;
4. One note in the sum of $60,679.61, to Credit Corporation; and

any further sums which may be advanced to take care of taxes, insurance, or prior incumbrances. The said Deed of Trust expressly creates a lien in the following language:

"That, (describing the consideration) the party of the first part (J. M. Leach, Jr., and Flora J. Leach, his wife, and James W. Leach and Dorothy V. Leach, his wife) hereby grants, bargains, sells and conveys unto the party of the second part, as Trustee, and his successors in trust, the following described real estate situated in the County of Crittenden, and the State of Arkansas, to-wit * * *

"Now, therefore, if the party of the first part shall pay all the indebtedness secured hereby this conveyance shall be null and void and shall be released at his expense, but if he shall fail to pay said indebtedness or any part thereof, or the interest thereon, when due or to pay the taxes and special assessments prior to the sale thereof for delinquent taxes or to pay any item due on account of insurances provided herein, then all of the indebtedness secured hereby shall, at the option of the holder or holders thereof, become due and payable and party of the first part hereby authorizes and fully empowers said trustee or any successor trustee, upon any such default to proceed to sell the property hereinabove described and to pay the amount then due hereunder."

The said instrument recites that the said Flora J. Leach and the said Dorothy V. Leach do thereby severally release and relinquish unto Cecil B. Nance, Jr., Trustee, for the benefit of Oliver and Credit Corporation all rights of dower and homestead in and to the described premises.

The said note for $16,519.26, was due and payable on the 15th day of January, 1968, and on the 23rd day of January, 1968, the principal and interest thereon were paid.

The remaining three notes have outstanding principal balances of $18,051.61, $51,282.36 and $60,416.07, respectively, although due and legal demand was repeatedly made for the payment thereof, and pursuant to the language of the notes the owners of each of said notes elected to and did accelerate all of the unpaid indebtedness. The aforedescribed notes provided that if they be not paid when due and be delivered to an attorney for collection, then 10 per cent of the amount of the principal unpaid, plus accrued interest, should be added as liquidated collection fees.

On April 5, 1967, the Partnership had executed and delivered to Credit Corporation a $71,497.64 promissory note, $56,780.00 of which represented the Partnership's assumption of the liability of the corporate predecessor on equipment sold out of trust.

The major contestants in this action have all prayed for an accounting and presented proof on these matters at the trial. The evidence establishes that the records and accounting submitted by Oliver and Credit Corporation, with the exception of the $1,706.94 claim for interest, should be accepted. In the first place, the difference between the parties as to the credit that should be given in the replevin action is slight. The Court adopts the agreement of the parties, as included in the letters exchanged by the parties' attorneys, that $79,000.00 was acceptable by both parties for the credit to be given on the replevin actions, with the $4,500.00 which Oliver gives credit subsequent to the agreement. The Court adopts the figure of $83,500.00 as the just and correct and proper credit on the replevin items.

The Court also adopts the accounting records applicable to the partnership at Marion. At page 32 of the transcript, counsel for the Corporation and Partnership stated that with regard to the Marion partnership "they have submitted a figure here with which we are almost in agreement except we will want a few more credits, and there won't be much difficulty on the Marion account." As submitted in the record, this amounts to $66,863.27. However, it includes as a credit machinery taken by replevin $7,298.48. This item is at issue and satisfactorily explained in the testimony reconciling the difference claimed by the corporation in its accounting.

The major difference in the contentions of the parties generally concerns the interest and attorney's fees included in the Oliver and Credit Corporation account. On this question the Court notes that there is included the sum of $1,706.94 as attorney's fees on the collection of one of the notes given by the partnership in the sum of $16,519.26. The record shows that the note was paid January 23, 1968, together with interest, only a few days after the due date. The payment was accepted by Oliver for both the principal and interest on the note and the Court accordingly disallows the $1,706.94 item.

With reference to the corporation account, the Court concludes that each item has been explained, including the credits on the replevin action and other items as itemized in Defendants' Exhibit No. 8. There is due in addition thereto interest and attorney's fees as provided in the notes referred to hereinabove. These, together with the amounts due on the notes, make up the total due in so far as the record establishes against the corporation and the guarantors.

After allowing all parties to this action proper credits, set-offs, claims and allowances, the Court finds that the Corporation, Barrie Moffatt and the Leach brothers owe the sum of $12,143.56 to Oliver; that the Corporation, Barrie Moffatt and the Leach brothers owe Credit Corporation the sum of $122,811.07; and that the Partnership and the Leach brothers owe Credit Corporation the sum of $70,866.90.

There exists in the original action when filed and when removed to this Court diversity of citizenship of the original parties, and the amount in controversy, exclusive of interest and costs, exceeded $10,000.00.

**408**

### Conclusions of Law

This Court acquired jurisdiction of this action upon the filing of the Petition for Removal under 28 U.S.C. Sections 1441 and 1446 by reason of the diversity of the parties' citizenship and the amount in controversy. 28 U.S.C. Section 1332. The Court retained jurisdiction when the additional parties were joined, under the principle as stated by Professor Moore:

> "When a federal court has jurisdiction over the main cause of action, it also has jurisdiction over any proceedings ancillary to that action, regardless of the amount of money involved, the citizenship of the parties, or the existence of a federal question in the ancillary suit."

(and cases cited thereunder.)

1 Moore's Federal Practice (2d ed.), Para. .90(3), p. 822.

The Plaintiffs, the Corporation and the guarantors failed to sustain their burden of proving by a preponderance of the evidence that Oliver breached its Dealer Contract. First, the Corporation failed to submit a request to Oliver for partial financing of the Chipman sale until subsequent to the sale and delivery of the equipment to Chipman Brothers and the failure of Chipman Brothers and Corporation to obtain financing of the entire equipment purchase in the sum of $120,000.00. Both J. W. Leach and Barrie Moffatt knew that Oliver had the right, under the Plan, to reject retail paper, solely at Oliver's option. There is no substantial evidence that in June, 1967, when the Corporation made its request of Oliver for financing, or for that matter, in July, 1967, the Corporation then held a valid, enforceable or perfected purchase-money security interest in any of the equipment sold and delivered Chipman Brothers. Even as late as the trial, when the Corporation tried to show that it held a purchase-money security interest, no substantial evidence was presented to show that it then had a valid, enforceable or perfected security interest in such equipment. This short-coming is contrary to the provisions of the Plan requiring a valid first lien on the equipment sold. Nor does the record reflect that the Corporation tendered any of the requisite documentation. Chipman Brothers, Mississippi residents, had leased land in Texas and used at least some of the tractors there. Moreover, the Oliver branch manager then regarded Chipman Brothers as a poor credit risk. The Plaintiffs offered no proof to rebut this except to show that in the three years from date of final delivery to the date of trial neither Chipman Brothers nor anyone else had paid anything on that portion for which financing was sought in mid-1967. The Corporation never satisfactorily explained why full financing of the Chipman sale was not arranged prior to final delivery on March 25th when the Corporation's obligations to pay Oliver and Credit Corporation for the 10 tractors had matured and no request had then been made under the Plan.

Both Corporation's employees and Oliver's employees were overly zealous in their efforts to persuade local banks to finance the remainder of the Chipman purchase. The record fails to reveal that subsequent to receipt of Oliver's July 13 letter the Plaintiffs made any attempt or effort to clarify the status of the Plan with reference to any future retail sales by the Corporation or that it made any efforts, either successful or unsuccessful, to finance retail sales. On the contrary, it is undisputed that the Corporation took it upon itself to dispose of some of its inventory without remitting proceeds to Credit Corporation in what is referred to as "sales out of trust", contrary to the security instruments. This action, in the Court's opinion, resulted in the deficiencies which prompted the settlement agreements of October 25, 1967, by the Corporation and Partnership, and officers and partners' individually executing and delivering the collateral security and the four notes which became the major sums on which Oliver and Credit Corporation seek relief. During this period, Oliver put the Corpora-

tion on a C.O.D. basis. The Court takes note of the fact that the Corporation's representatives and the members of the Partnership had the advice of counsel at the time of the negotiations and issuing of the notes with the security therefor. Earlier, on April 5, 1967, the Partnership had given Credit Corporation its promissory note of which $56,780.00 represented sales out of trust. The record does not show that Credit Corporation was obligated to do this financing, and in their post-trial briefs counsel for Oliver and Credit Corporation point out the irony of the Corporation's position: It alleged that Oliver failed to make available retail financing when Oliver and Credit Corporation, in addition to inventory financing, by October 25, 1967, had provided the dealer with $180,302.00 in financing which were prompted by sales out of trust and other delinquencies. The $180,302.00 figure is the aggregate of the face amounts of the four notes. The record discloses that next Oliver wrote its letter of December 12, 1967, to the Corporation declaring Oliver's intent to terminate the Dealer Contract if Corporation failed to fully pay by December 22nd the $29,761.46 past due. On the 21st, the day before the deadline, the Plaintiffs filed their original action against Oliver.

The Court finds and holds that Oliver did not breach its Dealer Contract and Plaintiffs are therefore denied the relief sought for rescission and cancellation of the guaranty, and it is not necessary for the Court to go into various secondary questions such as whether the breach was waived and whether the equities entitle the Plaintiffs to rescission and cancellation.

The major contestants in this cause all seek an accounting, and the Corporation is entitled to a proper credit for all property which Oliver and Credit Corporation have heretofore recovered.

Three of the promissory notes which bear date of October 25, 1967, and are sued upon are valid and enforceable; consequently interest and attorneys' fees should be allowed thereon.

a. Oliver is entitled to recover from the Corporation, the Leach brothers and Barrie Moffatt the principal balance on said $27,471.68 note, interest thereon at the rate of 8 per cent per annum from August 25, 1967, interest at 8 per cent on the $7,698.68 credit from August 25, 1967, until March 11, 1968, and attorneys' fees at the contract rate of 10 per cent.

b. Credit Corporation is entitled to recover from the Corporation, Leach brothers, Barrie Moffatt the principal balance on said $77,352.84 note, 8 per cent interest thereon from August 25, 1967, 8 per cent interest on the $16,936.77 credit from August 25, 1967, until March 11, 1968, and 10 per cent attorneys' fees.

c. Credit Corporation is entitled to recover from the Partnership and the Leach brothers the principal balance on said $60,679.61 note, 8 per cent interest thereon from August 25, 1967, and 10 per cent attorneys' fees.

The dollar amounts allowed are incorporated in the conclusions regarding the accounting between the parties set forth hereinafter.

Attorneys' fees in the amount of $1,706.94 sought on the collection of the $16,519.26 note should be disallowed. The record shows principal and interest were paid and accepted January 23, 1968, only a few days after the due date.

The guaranty of Corporation's obligations to Oliver and to Credit Corporation executed and delivered by the Leach brothers and Barrie Moffatt on July 22, 1966, is valid and enforceable; and Oliver and Credit Corporation each is entitled to a recovery based thereon.

The Deed of Trust, executed October 25, 1967, and given to secure four promissory notes of even date, by the Leach brothers and their wives covering approximately 320 acres of real estate situate in Crittenden County, Arkansas and recorded at Book 411, page 355 with the Crittenden County Circuit Court Clerk and ex-officio Recorder is valid and enforceable. If the sum of $165,511.79 (representing the aggregate of the prin-

cipal balance due on said three notes, interest and attorney fees, but after allowing credits as set forth in Oliver's accounting) is not paid within thirty (30) days from date of entry of the judgment pursuant to this opinion, the equity of redemption of the Leach brothers and their wives and of Staple Cotton Discount Corporation (as a junior lienholder) should be foreclosed and the property sold for the purpose of satisfying the said sum of $165,511.79, by a commissioner, to be appointed by the Court, upon such terms and notice as law may require.

The deed of trust executed April 5, 1967, to secure a $71,497.64 note, is held not to secure the $60,679.61 note which bears date of October 25, 1967, and therefore foreclosure thereon should not be allowed. The $71,497.64 note was replaced and taken up by the said $60,679.61 note.

The Orders of Delivery entered March 11, 1968, should be sustained. To this action of the Court there is no contrary contention by the Corporation, the Partnership, Barrie Moffatt and the Leach brothers.

The Complaint of Corporation, Barrie Moffatt and Leach brothers should be dismissed on the merits.

Oliver and Credit Corporation are entitled to a money judgment in the aggregate amount of $205,821.53, which includes all claims under the four promissory notes and after allowing all proper credits, namely:

a. Oliver should be allowed a recovery from the Corporation, Barrie Moffatt and the Leach brothers, jointly and severally in the sum of $12,143.56, with interest at the rate of 6 per cent per annum from the —— day of July, 1970.

b. Credit Corporation should be allowed a recovery from the Corporation, Barrie Moffatt and the Leach brothers, jointly and severally, in the sum of $122,811.07, with interest at the rate of 6 per cent per annum from the —— day of July, 1970. The sum of $83,579.31 represents that part of $122,811.07, which is recoverable under said note; the differential of $39,231.76 is owing by the Corporation by reason of the financing of inventory acquired and is owing by the individuals under the Guaranty of the Corporation's obligations.

c. Credit Corporation should be allowed a recovery from the Partnership and the Leach brothers, jointly and severally, in the sum of $70,866.90, with interest at the rate of 6 per cent per annum from the —— day of July, 1970. The sum of $69,788.92 represents that part of $70,866.90 which is recoverable under said note; the differential of $1,077.98 is owing by the Partnership by reason of the financing of inventory acquired and is owing by the individuals under the Guaranty of the Partnership's obligations.

That part of the Complaint of Ralph H. Hineman, Trustee, and Oliver, seeking judicial foreclosure of approximately 3.43 acres of land in Lee County, Arkansas, should be dismissed on the merits and their lien should be released and discharged.

That Credit Corporation and Oliver each has a lien on the approximately 320 acres in Crittenden County, Arkansas, described above, to secure the payment of the sum of $165.511.79 (representing the aggregate of $12,143.56, plus $83,579.31, plus $69,788.92), interest and costs accruing, which is prior and paramount to any right, title, claim, lien or interest or equity or right of dower or homestead of the Defendants, J. M. Leach, Jr., J. W. Leach, Dorothy V. Leach and Flora J. Leach, Staple Cotton Discount Corporation, and H. T. Odom, Trustee. Thus, only $165,511.79 of the said $205,821.53 is secured by the Crittenden County acreage.

That if said sum of $165,511.79, and the aforestated interest thereon shall not be paid within 25 days from this date, together with all the costs of this action, the Commissioner of this Court, hereinafter named, after he shall have advertised the time, terms and place of sale for a period of 20 days by publication in some newspaper, published in

Crittenden County, Arkansas, and having a bona fide circulation therein, by at least two insertions, should be ordered to sell the aforedescribed Crittenden County acreage at the front door of the Courthouse at Marion, in said County, at public auction to the highest bidder, on a credit of three months.

The purchaser at such sale should be required to execute bond, with approved security, to secure the payment of the purchase money, and a lien should be retained upon said property as additional security for the payment of such purchase money. If either Oliver or Credit Corporation should become the purchaser at such sale for a sum equal to or less than the said sum of $165,511.79, in lieu of giving the bond as herein required it should be allowed, upon confirmation of such sale, to credit the amount of its bid upon the said sum, which shall be an extinguishment of the amount which shall be adjudged to be due to the extent of credit; and if its said bid shall exceed the amount to be adjudged to be due, with interest, it shall be required to execute bond only for the excess.

That said lien in favor of Staple Cotton Discount Corporation, the equity of redemption held by Staple Cotton Discount Corporation therein and the interest of H. T. Odom, Trustee, should all be declared inferior, subordinate and subject to the lien of the White Motor Credit Corporation and the White Farm Equipment Company, created by virtue of the lien of said Deed of Trust of record at Book 411, page 355, in the office of the Circuit Court Clerk and ex-officio recorder of Crittenden County, Arkansas, and by virtue of statutory merger and name change.

That upon the sale of said property and confirmation of such sale by the Court, all right, title, claim, interest and equity of redemption of any and all of the Defendants, J. M. Leach, Jr., J. W. Leach, Flora J. Leach, Dorothy V. Leach and Staple Cotton Discount Corporation, and all the dower and homestead rights of Dorothy V. Leach and Flora J. Leach herein in and to said property, and every part thereof, should be adjudged and decreed from that date to be foreclosed and forever barred.

That ———— should be appointed as Commissioner of this Court to execute the judgment and decree, when entered, and he should be directed to make the sale, as herein provided, and to promptly thereafter report his action to this Court.

That the part of the Complaint and Counterclaim filed herein by Ralph H. Hineman, Trustee, and White Motor Credit Corporation seeking relief against Marguerite P. Love, Defendant, should be dismissed on the merits.

That the part of the Complaint and Counterclaim filed herein by White Farm Equipment Company (successor to the Oliver Corporation), White Motor Credit Corporation and Ralph H. Hineman, Trustee, against John R. Walker, Trustee, and John Hancock Mutual Life Insurance Co. (a corporation) should be dismissed without prejudice.

And the Court should retain control of this cause for such orders as may be proper to enforce the rights of the parties hereto, as herein adjudged.

A judgment will be entered accordingly.